## Lucas v. Commonwealth.

December 6, 1949.

Cubbage & Cubbage and Robert O. Trent for appellant.

A. E. Funk, Attorney General, and Squire N. Williams, Jr., Assistant Attorney General, for appellee.

JUDGE HELM—Affirming.

Appellant, Murtha Lucas, charged with murder, was found guilty of voluntary manslaughter and his punishment fixed at 15 years in prison. He appeals.

On January 17, 1948, about 7:30 p. m., appellant shot and killed Jesse Johnson in the store of Raymond Kessee at Dyer, a village with three stores, in Breckinridge County. Appellant maintains the judgment of the lower court should be reversed because (1) Taking the evidence as a whole, reasonably and rationally considered, it is not sufficiently convincing to justify conviction of the defendant, and (2) even if the jury had been warranted in finding the defendant guilty, the verdict returned is excessive and is palpably against the evidence and is the result of passion and prejudice.

Johnson, a mechanic, had been operating a garage at Dyer for about one or two years. Mattie Lucas, a sister of appellant, had lived with Johnson a part of that time, although they were not married. Appellant remonstrated with Johnson and insisted that if they were going to live together they ought to marry. At the time of Johnson's death he and Mattie Lucas were not living together; he was preparing to marry another girl. The night Johnson was killed, appellant went into Kessee's store; he stood playing or watching a pin ball machine in a corner of the room; a short time later, Johnson came into the store; shortly after that, Johnson was fatally shot by appellant.

Funeral director Dhonau found bullet wounds; two in the right chest, and one through the front of the head. Either was sufficient to produce death. There was also a wound in the left arm, above the elbow. The wounds appear to have been made from the front. He found two knives, one a "small silver colored knife," the other a "three-bladed bone handle knife," in his right pants pocket.

From the testimony for the Commonwealth it appears that appellant was at Mrs. Hoskinson's store at Dyer about 6:30 or 7 p. m. He was pale. Mrs. Hoskinson noticed the handle of a pistol sticking out of his pocket; he "pushed it down in his pocket." Johnson had been in her store that afternoon. He had asked her to request Mattie Lucas to come to her store; Mattie sent word that she "did not want to talk to or see him;" Johnson said, "Well, I cannot understand why she does not want to see me, the only thing I want to see her about is her canned fruit. I will talk to her in your store and I won't harm a hair on her head."

About an hour after the shooting, Lett Paul, deputy sheriff, went to Kessee's store. He found Johnson on the floor. Nobody was in the place but Johnson; the store was not locked. An "open, yellow-handled knife was lying there by Johnson, about half hidden under his body." He did not know how it got there. The body of Johnson was near the front door, his feet down about halfway of the door, his head toward the pin-ball machine, his face on the floor. Johnson's truck was at the corner of the store; in it he found "a suit of clothes * * * nice clothes." He arrested Lucas. Lucas delivered a pistol to him, with which he admitted he shot Johnson.

J. W. Lyons was present in Kessee's store when Lucas shot Johnson. Lucas was in the store when he arrived, "shooting the pin-ball machine." Johnson came in, walked around behind the stove, was talking to Junior Lyons. The stove was near the center of the room. Johnson was standing facing Lucas; Lucas started firing shots which hit Johnson. Johnson had not done or said anything to Lucas. As Lucas started shooting, Johnson threw his hands up, as if to protect himself, and started falling toward Lucas. As he continued to fall, Lucas continued to shoot him; Johnson fell to the floor on his face. Lyons was looking at Johnson. Asked if Johnson had any weapon, he said, "I never saw any;" he didn't see anything in Johnson's hands. Asked on cross-examination if he could be sure about this, he replied, "I never seen any, if he did."

From a sketch of the store room, filed with the record, it appears that the front door is in about the center of the front of the room, the stove about the center of the room, the pin-ball machine in the front right corner as you enter, a bench near the pin-ball machine and between it and the stove and to the right of the front door. Counters are near the walls at the back and on the left as you enter.

Lyons says Johnson fell on his face between the bench and the front door. While the shooting was going on, Lucas was standing between the pin-ball machine and the bench. After the shooting, Kessee said something to Lucas; Lucas drew his gun on Kessee; pointed it at him; Lucas came around, leaned over the body of

Johnson; Lucas still had his gun in his hand; he waved his gun and told everybody to get out.

Henry Carter went in the store; Lucas was there. Later, Johnson came in and walked to the counter at the rear; he came back and stopped between the stove and the door; "kind of in front of the stove." Carter was at the pin-ball machine. Immediately after the shot was fired he saw Johnson; Johnson had his hands up; he did not see anything in Johnson's hands; as more shots were fired, Johnson "kind of went forward;" he got nearer to Lucas as he fell forward. Carter did not see any knife in the hands of Johnson, or see one fall from his hands; he "did not see any knife."

George Hoskinson, 9 years of age, was at Kessee's store when Johnson was shot. Johnson was "standing by the stove warming his hands" with his hands behind his back. While Johnson was warming his hands, Lucas fired a shot; Johnson put up his hands; as Lucas continued to shoot, Johnson was falling; he "fell right toward" Lucas. He did not see any knife in Johnson's hands; he did not have any weapon of any kind. M. C. Hoskinson heard the first shot, turned and saw Johnson falling forward with his hands up. He did not see Johnson with any knife on that occasion.

Junior Lyons talked to Johnson just before he was shot. Johnson was joking with Junior; he was at the stove warming, with his hands behind him; Junior was about three feet from him. Payton Lyons, whom Junior had seen with Lucas "a right smart," called to Johnson from the back of the store, "something about a sandwich" Kessee was cutting. Junior had been talking to Johnson up to the time he turned to look at Payton; about that time a gun fired; Johnson was then about six or seven feet from Lucas. After the gun fired, Johnson had his hands up and began falling forward toward Lucas; Lucas "was shooting him all the time he was falling." Junior did not see any weapon in Johnson's hands. When Johnson fell, Lucas, with his pistol in his hand, "came to the side of him * * * bent over him." Payton and Kessee were in the back of the store. Kessee said, "My Lord, Murtha, what have you done?" Lucas "drew the gun in Kessee's face."

For the defense: Murtha Lucas is 32 years of age,

a tenant farmer, lived about three-quarters of a mile from Dyer. He was spending Saturday night with his brother, Herb; his sister, Mattie, was staying there; Jesse Johnson had lived in the vicinity of Dyer for over a year; he had been living with Lucas' sister, Mattie; Lucas said to Johnson, "Jesse, you ought to marry or quit living with one another. All of us boys is mad about you not being married and living together." Jesse replied, "I don't think you can do anything about it." Johnson accused Lucas of stealing his beer, cursed him, and called him bad names. Johnson, he was told, had threatened to kill him. Lucas had been carrying a 32 caliber automatic to protect himself against Johnson. On the night of January 17 he was at Kessee's store. He introduced a sketch, a drawing of the store. He was at the pinball machine; Johnson came up and made a "lick" at him; when "he made the lick and hit me, I threw up my hand and pushed him back and saw the knife in his hand. I had a gun in my front pocket, and when he went back, I rushed to my pocket and got my gun." He made another attempt to cut him with the knife; that was when he shot Johnson; the "gun emptied like that. I was so excited I don't guess I could have stopped. The gun emptied quicker than I thought it did." He did not point the gun at Kessee, and did not order anybody out. He had been carrying the gun eight or nine days; nobody could see it; no one knew he had it; his sister Mattie had not given him the gun; it did not belong to Johnson, he bought it from a soldier in Louisville about a year ago.

Payton Lyons says, "I turned to Jesse and asked him if he wanted a sandwich and he said no. When I turned around, he said, 'I believe I will take one.' Raymond Kessee cut him off one. Jesse did not come up and get it, but was walking down the aisle toward Murtha with his hand behind him. * * * He reached out and made a lick at Murtha when he got up even with him. * * * He kept striking at him. * * * He had an instrument in his hand, * * * it was shining, * * * when Jesse struck at him, Murtha went to shooting. * * * Johnson * * * never fell until after Murtha quit shooting. * * * Murtha was standing by the pin-ball machine in the corner" when the shooting took place. When "Johnson fell, there was a knife kind of in under him." He did not

see Murtha point a gun at Raymond Kessee, and did not hear him order anybody out of the store.

Ernest Allen, Jr. testified: "I saw him strike at Murtha before I saw the gun. I don't know if he had anything in his hand or not." Asked if Johnson's head or feet was toward Lucas, he said, "His head was toward Murtha Lucas."

Mattie Lucas testified that she had lived with Jesse Johnson four and one-half years, in Louisville and at Dyer. Johnson had told her he was going to marry a girl at Caneyville; she knew the girl; Johnson had sent word to her on the day he was killed that he wanted to see her to arrange for her to get her canned fruit and things. She had filed a breach of promise suit against him; he had filed an injunction suit against her to enjoin her from coming around and molesting him.

The defendant introduced a number of witnesses who stated that Johnson had made threats against Lucas. The Commonwealth, under proper admonition of the court, introduced a number of witnesses to show that the general reputation of Lucas for truth, veracity, and general moral conduct was bad.

From this summary, it is apparent that the testimony was highly conflicting. The jurors, who were the judges of the weight and credibility of the testimony, saw and heard the witnesses. The jury may believe one set of witnesses as against another. The court submitted the case to the jury under proper instructions, including an instruction on self-defense. The jury returned a verdict finding appellant guilty of manslaughter.

We have made a careful study of this case, which was well tried. We believe the evidence was sufficient to take the case to the jury. We cannot agree that the verdict was excessive or palpably against the evidence.

The judgment of the circuit court is affirmed.